UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 10-22750-Civ-COOKE/TURNOFF

EUGENE "MERCURY" MORRIS,

    Plaintiff

vs.

NATIONAL FOOTBALL LEAGUE
RETIREMENT BOARD,

    Defendant.
_____/

## OMNIBUS ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

THIS MATTER is before me on the Plaintiff's Motion for Summary Judgment (ECF No. 22) and Defendant's Motion for Summary Judgment (ECF No. 29). I have reviewed the arguments, the record, and the relevant legal authorities. For the reasons provided in this Order, summary judgment is granted in favor of Defendant.

### I. BACKGROUND

This is an action to recover benefits under the terms of a retirement plan pursuant to 29 U.S.C. § 1132(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"). Plaintiff, Eugene "Mercury" Morris, is a former National Football League ("NFL") player. Defendant is the NFL Retirement Board (the "Retirement Board" or "Board"), which manages claims under the Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Plan").[1]

---

[1] Mr. Morris was originally a participant in the Bert Bell NFL Player Retirement Plan. That plan merged into a new plan in 1994 to form the Bert Bell/Pete Rozelle NFL Player Retirement Plan.

The Retirement Plan

The parties agree on the material facts in this case.[2] Mr. Morris is a participant of the Plan. Mr. Morris played eight credited seasons—as the Plan defines that term—of NFL football from 1969 to 1976. The version of the Plan in effect in 1978 and 1980,[3] contain three articles at issue: Article 4 governs benefits upon normal, early, and deferred retirement; Article 5 governs total and permanent disability benefits; Article 6 governs line-of-duty disability benefits.

Section 4.6, the main provision at issue, states, in relevant part:

> Any Vested Player who leaves football on or after March 1, 1977, may request, by written notice to the Retirement Board, an "Early Payment Benefit" as defined below. Said request will be acted upon by a committee of the Retirement Board consisting exclusively of the voting members appointed by the [NFL Players Association]. After appropriate communication with the Vested Player, if such committee determined in its sole and absolute discretion, that such distribution would be in the Vested Player's best interest, then such distribution will be made. An Early Payment Benefit shall be payable to such Vested Player in a lump sum and shall be an amount equal to the present value of 25% of his Benefit Credits as of the date of payment to the Player. . . . The remaining 75% of the then present value of his earned Benefit Credits will be payable in monthly installments beginning at age 55 unless such Player elects to receive the remaining 75% in the form of a reduced early retirement benefit beginning at (or after) age 45 or an increased deferred retirement benefit no later than age 65. In the event that a benefit subsequently becomes payable with respect to such Player in accordance with Section 5.1, 5.4, 6.3 or 7.3 . . . then the amount of such benefits shall be determined as follows:
> (A) If the Player makes application for the Early Payment Benefit on or before March 31, 1982, the amount of any benefit payable in accordance with Section 5.1, 5.4, 6.3 or 7.3 shall not be adjusted to reflect the distribution of the Early Payment Benefit.

On January 30, 1979, at the Retirement Board's regular meeting, the Board discussed "the inclusion of players in the Early Retirement Payment section who reported in the 1976

---

[2] The facts set forth in the parties' Statement of Undisputed Facts are deemed admitted to the extent that they are supported by evidence in the record, and are not specifically disputed in the opposing statement of facts. S.D. Fla. L.R. 7.5(D); *see also Gossard v. JP Morgan Chase & Co.*, 612 F. Supp. 2d 1242, 1245-1246 (S.D. Fla. 2009).

[3] The 1978 and 1980 versions of the Plan are organized in the same way. Section 4.6 is also the same in both versions.

2

training season and who then left football." (Minutes of Retirement Board Meeting, January 30, 1979, ECF No. 31-2, at 2). The Board noted that "the inclusion of the players who reported for football in the 1976 training camp could add 154 more players eligible for retirement benefits." *Id*. The Board decided to conduct a study of the matter.

On June 13, 1979, the Retirement Board adopted the following resolution concerning Section 4.6:

> With respect to the Early Payment provision, after discussion the following resolutions were suggested:
> * * *
> RESOLVED FURTHER, that vested players following the 1976 season who leave football after the 1976 season, may request by written application in the form required by the Retirement Board, consideration for an Early Payment benefit. If all three conditions are satisfied, following a further determination by a committee of the Retirement Board consisting exclusively of the voting members appointed by the NFLPA that such distribution is in the best interest of the applicant, the Early Payment benefit will be paid in accordance with the Plan.
> In respect to players who actually leave football after the 1976 season on a permanent basis, for administrative purposes the date of receipt by the Fund Administrator of the signed written application to this effect will determine the date the applicant left football.
>     Upon motion . . . the foregoing resolutions were unanimously adopted.

(Minutes of Retirement Board Meeting, June 13, 1979, ECF No. 31-3).

Mr. Morris's Applications for Benefits and Earlier Litigation

On December 10, 1979, Mr. Morris executed an "Application for Early Payment Benefits (25% Lump Sum)" to receive an Early Payment Benefit ("EPB") under the Plan. (ECF No. 31-4). In the form, Mr. Morris confirmed, "I have left football permanently and do not expect to return, and hereby apply for my Early Payment benefit." (*Id*.) On March 26, 1980, at the NFL Retirement Board's regular meeting, the Board approved Mr. Morris's application for an EPB in the amount of $7,609.01. (Minutes of Retirement Board Meeting, March 26, 1980, ECF No. 31-

3

5).  On March 31, 1980, the Retirement Board notified Mr. Morris that the Board approved his application for an EPB.  (ECF No. 31-6).  The letter clarified:

> You will be paid a lump sum equal to 25% of the present value or worth of your Benefit Credits as of March 31, 1980.  The remaining 75% of your Benefit Credits will be paid monthly when you retire on an early, normal or deferred pension.

(*Id*.)  Mr. Morris admits he received the $7,609.01 lump sum EPB on April 1, 1980.

On January 14, 1991, Mr. Morris entered into a Settlement Agreement and Specific Release (the "Settlement Agreement" or "Agreement") with the Board to settle his line-of-duty and permanent disability benefits claims under Articles 5 and 6 of the Plan.  Section 9 of the Agreement provides:

> <u>Morris' Retirement Benefits</u>.  Nothing set forth herein shall waive, diminish, alter or modify Morris' right to receive full and appropriate retirement benefits under the Bert Bell NFL Player Retirement Plan or any amendments thereto, and no payment herein shall diminish Morris' entitlement to full and appropriate entitlement to retirement benefits under the Bert Bell Plan.

In November 25, 1995, Mr. Morris filed suit in this Court before the Honorable K. Michael Moore, seeking a declaration of his rights under the Settlement Agreement.  *See* Order Granting Motion to Dismiss, *Morris v. Bert Bell NFL Ret. Plan*, No. 96-03379 (S.D. Fla. Jun. 26, 1997), ECF No. 27.  He alleged that the Board refused to pay retirement benefits to him on the ground that he waived his rights under the Agreement.  *Id*. at 1.  Judge Moore dismissed Mr. Morris's claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and held that the Settlement Agreement did not govern retirement benefits, nor did it provide for "a separate class of retirement benefits arising from disability."  *Id*. at 7.

Not content with this ruling, Mr. Morris filed an ERISA action against the Retirement Plan before the Honorable Joan A. Lenard, seeking Article 4 retirement benefits based on his alleged right to disability benefits.  *Morris v. Bert Bell/ Pete Rozelle NFL Player Ret. Plan*, No.

05-21369, 2006 WL 5517904, at *1 (S.D. Fla. Mar. 27, 2006).  Judge Lenard dismissed the case on *res judicata* grounds.  *Id*., *aff'd in* 208 F. App'x 742 (11th Cir. 2006).

On November 20, 2007, Mr. Morris submitted to the Board an Application for Retirement Benefits.  (ECF No. 31-9).  Mr. Morris elected to receive a deferred retirement benefit in the form of a life annuity beginning February 1, 2008.  (ECF No. 31-15).  On December 7, 2007, the Board acknowledged receipt of Mr. Morris's application, and calculated his monthly payments for a life-only pension at $3,102.07.  (ECF No. 31-10).

Mr. Morris contested this calculation.  (ECF No. 31-12).  He raised two main arguments.  First, Mr. Morris argued that Section 9 of the Settlement Agreement amended the Plan and required the Board to pay him his full, unaltered retirement benefits; therefore, the Board could not reduce his retirement benefits by 25%.  Second, he argued that Section 4.6 of the Plan does not apply to him because he left football in 1976, and that section specifies that the EPB option applies only to "[a]ny Vested Player who leaves football on or after March 1, 1977."  Mr. Morris also appeared to make a related argument that the Plan entitled him to additional benefits under Section 4.6(A), which governs any Player who applies for the EPB before March 31, 1982.

On January 23, 2008, the Board informed Mr. Morris that they would consider his arguments at their February 4, 2008 meeting.  (ECF No. 31-15).  On February 11, 2008, after considering his claim for additional benefits, the Plan Director informed Mr. Morris that the Board denied his claim.  (ECF No. 31-18).  Mr. Morris received his first monthly payment of $3,102.07 on around February 7, 2008.  (ECF No. 31-17).

Through this Complaint, Mr. Morris seeks payment of 100% of his retirement benefits, without a 25% reduction for the EPB he received in 1980.  (Compl. ¶¶ 1-2).  He also disputes the Board's calculation of his Benefits Credits.  According to Mr. Morris, his total monthly

5

retirement benefit should be $6,053.60.  (Compl. ¶¶ 1-2).  Mr. Morris appears to set forth four separate theories which entitle him to the relief:  (i) Section 9 of the Settlement Agreement amended the Plan to require the Board to pay him full retirement benefits without a 25% deduction; (ii) Section 4.6 of the Plan does not apply to him because he left football before March 1, 1977; (iii) he qualifies under Section 4.6(A) to receive certain disability payments; and (iv) the Board incorrectly calculated his monthly payments using a lower Benefit Credit amount.

## II.  LEGAL STANDARDS

Although this matter is before me on cross motions for summary judgment, in an ERISA benefits denial case such as this one "the district court sits more as an appellate tribunal than as a trial court."  *See Curran v. Kemper Nat. Servs., Inc.,* No. 04-14097, 2005 WL 894840, at * 7 (11th Cir. 2005) (quoting *Leahy v. Raytheon Co.*, 315 F.3d 11, 17-18 (1st Cir. 2002)).   The court "does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary."  *Id*.  Thus, there "may indeed be unresolved factual issues evident in the administrative record, but unless the administrator's decision was wrong, or arbitrary and capricious, these issues will not preclude summary judgment as they normally would."  *Pinto v. Aetna Life Ins. Co.,* No. 09-01893, 2011 WL 536443, at *8 (M.D. Fla. Feb.15, 2011); *Turner v. Am. Airlines, Inc.*, No. 10-80623, 2011 WL 1542078, at *4 (S.D. Fla. Apr. 21, 2011) ("where, as here, the decision to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." (internal quotations omitted)).

### III. ANALYSIS

**A. Framework for Review of Benefit Determinations in ERISA Cases**

Under 29 U.S.C. § 1132(a)(1)(B), a benefit plan participant or beneficiary may bring a civil action to recover benefits due to him under the terms of the plan, and to enforce or clarify his rights under the terms of the plan. The provision does not set forth the appropriate standard of review for actions challenging benefit eligibility determinations. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989). The Supreme Court has held that where a plaintiff challenges a denial of benefits under § 1132(a)(1)(B), a court must review such denial "under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115.

The Eleventh Circuit developed a six-step framework for analyzing an administrator's benefits determination:

>   (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
>   (2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
>
>   (3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
>
>   (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
>
>   (5) If there is no conflict, then end the inquiry and affirm the decision.
>
>   (6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*Williams v. BellSouth Telecomms., Inc.,* 373 F.3d 1132, 1137 (11th Cir. 2004); *Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1195 (11th Cir. 2010).[4]

**B.  Application of Analytical Framework**

1.  <u>Step One:  Was the Administrator's Decision "Wrong"?</u>

A court reviews the denial of ERISA benefits de novo, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone*, 489 U.S. at 115.  As discussed below, the Plan administrator in this case has authority to determine benefit eligibility and construe the terms of the Plan.  Thus, I will begin the analysis at step two of the *Williams* framework; "in other words, the Court will proceed as if Defendant's decision, were it reviewable under the *de novo* standard, was in fact wrong." *See Pinto*, 2011 WL 536443, at *9; *Turner*, 2011 WL 1542078, at *5; *see also Eady v. Am. Cast Iron Pipe Co.*, 203 F. App'x 326, 328 (11th Cir. 2006) ("It is clear from our precedent that de novo review is not appropriate in this case because the plan at issue grants discretion to the administrator.").

2.  <u>Step Two:  Did the Administrator have Discretion?</u>

The parties agree that the Plan vests the Retirement Board with discretionary authority to determine benefit eligibility and construe the terms of the Plan.  Article 8.2 of Plan restated as of April 1, 2009,[5] provides:

> The Retirement Board will be the 'named fiduciary' of the Plan within the meaning of section 402(a)(2) of ERISA, and will be responsible for implementing

---

[4] The Supreme Court has called into question the sixth step of this analysis. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008).  The rest of the analytical framework remains intact. *Capone*, 592 F.3d at 1196.  *Glenn* does not affect the analysis in this case, as I need not reach the sixth step of the analysis.

[5] This is the language of the provision in effect when the Board made the decision at issue in this case. Article 8.4 of the 1978 and 1980 versions of the Plan, however, include similar language.

> and administering the Plan, subject to the terms of the Plan and Trust. The Retirement Board will have full and absolute discretion, authority and power to interpret, control, implement, and manage the Plan and the Trust. Such authority includes, but is not limited to, the power to: (a) Define the terms of the Plan and Trust, construe the Plan and Trust, and reconcile any inconsistencies therein; (b) Decide claims for benefits . . ..

Where, as here, the Plan Administrator has discretion to review a participant's claim, I must determine whether the Administrator had "reasonable grounds" to support his or her decision. The standard of review is the more deferential arbitrary and capricious standard. *See Capone*, 592 F.3d at 1195.

      3. <u>Step Three: Do Reasonable Grounds Support the Administrator's Decision?</u>

In a February 11, 2008 letter, the Board denied Mr. Morris's claim for increased retirement payments. The Board concluded that Mr. Morris's arguments for additional retirement benefits had no merit, and declined to recalculate his monthly retirement payments.

Under the arbitrary and capricious standard of review, a court is "limited to deciding whether the [Administrator's] interpretation of the plan was made rationally and in good faith." *Cagle v. Bruner*, 112 F.3d 1510, 1518 (11th Cir. 1997). The district court must limit its review to "consideration of the material available to the administrator at the time it made its decision." *Oliver v. Coca Cola Co.*, 497 F.3d 1181, 1195 (11th Cir. 2007), *vacated in part on other grounds*, 506 F.3d 1316 (11th Cir. 2007). (internal quotations omitted). This Court's review is therefore limited to whether reasonable grounds exist to support the Board's denial of benefits to Mr. Morris based on the administrative record before it.

"[W]here plan fiduciaries have offered a reasonable interpretation of disputed provisions, courts may not replace it with an interpretation of their own-and therefore cannot disturb as an abuse of discretion the challenged benefits determination." *De Nobel v. Vitro Corp.*, 885 F.2d 1180, 1188 (4th Cir. 1989). Where a plaintiff sets forth an interpretation of the Plan that is

9

different from the one that the Administrators adopted, "even assuming [plaintiff's] construction were reasonable, as between two competing interpretations of the Plan, [a court is] bound by that of the Administrators if it is not arbitrary and capricious." *Lowenstern v. Int'l Ass'n of Machinists & Aerospace Workers*, 479 F.2d 1211, 1213 (D.C. Cir. 1973). However, a court cannot accept an ex post interpretation of a plan, which "would render other Plan language of no moment." *Jani v. Bert Bell/Pete Rozelle NFL Ret. Plan*, 209 F. App'x 305, 318 n.10 (4th Cir. 2006).

> a. *The Board's Decision that Section 4.6 Applies to Mr. Morris was not Arbitrary or Capricious*

Mr. Morris argues that the Board's denial of his claim lacks reasonable grounds because Article 4.6 does not apply to him, as he left football in December 1976. Mr. Morris further argues that the Board's ruling that the 25% reduction in benefits applies to him, a player who actually left football before March 1, 1977, renders the expressly stated March 1, 1977 date meaningless.

"To determine whether the administrator's denial of benefits was arbitrary and capricious, we begin with the language of the Plan itself." *Oliver*, 497 F.3d at 1195. The operative version of the Plan at issue provides that "[a]ny Vested Player who leaves football on or after March 1, 1977" may apply for the EPB. On June 13, 1979, the Board adopted the interpretive rule that "[i]n respect to players who actually leave football after the 1976 season on a permanent basis, for administrative purposes the date of receipt by the Fund Administrator of the signed written application to this effect will determine the date the applicant left football."

The Board's interpretation and application of the 1978 and 1980 versions of the Plan is reasonable.[6] The interpretive rule is clear that the phrase "leaves football," means the date in which the Administrator receives a written application from the player stating that he permanently left football. On around December 10, 1979, the Board received Mr. Morris's application stating that he permanently left football.[7] Under the Plan's rules, as amended, the Board treats the date in which Mr. Morris applied for the EPB—December 1979—as the date he left football. That date is after March 1, 1977. For purposes of Section 4.6, in light of the Board's June 13, 1979 interpretive ruling in place at the time Mr. Morris applied for the EPB, Mr. Morris is a vested player who left football after March 1, 1977. Reasonable grounds therefore support the Board's decision that, in 1980, Mr. Morris was eligible for the EPB.

The factual background of the Board's determination indicates that it made the decision in good faith. The Board first adopted the interpretive rule after conducting a study on "the inclusion of players in the Early Retirement Payment section who reported in the 1976 training season and who then left football." The impetus for adopting the interpretation was, at least in part, to "add 154 more players eligible for retirement benefits."

The Board's consistent and uniform interpretation and application of the Plan as to Mr. Morris is also persuasive and indicative of good faith. The decision does not reflect an ex post interpretation that the Board adopted in response to litigation, and the Board's interpretation of

---

[6] My discussion of the Board's interpretation of the Plan refers to the Board's February 11, 2008 decision to deny Mr. Morris's claim for increased benefits. Mr. Morris does not challenge the Board's July 13, 1979 interpretive rule in this action, nor does he indicate that he ever challenged that ruling before the Board.

[7] Mr. Morris disputes that he confirmed he left football by signing the application on December 10, 1979, because the language "I have left football permanently and do not expect to return, and hereby apply for my Early Payment Benefit" was pre-printed on the form, rather than handwritten by him. This argument has no basis in the law or common sense. By signing below the statement printed on the form, he adopted it along with any other information on the form.

11

the phrase in Section 4.6 did not change from 1979 to the present. In 1980, it functioned to allow Mr. Morris to obtain an early payment of $7,609.01. Having taken those funds, Mr. Morris must now face the consequences of receiving that early payment, which is to receive retirement benefits with a 25% deduction.[8]

Finally, I find that the Board's interpretive ruling does not render meaningless the provision that "[a]ny Vested Player who leaves football on or after March 1, 1977" may apply for the EPB. Rather, the interpretative ruling provided an administrative standard for what the Board would consider "leaving football" in the case of players who actually left in 1976. Football players occasionally announce their retirement verbally, but change their minds and return to play. This interpretive rule merely provides a definitive manner in which to determine when a football player "leaves football" for purposes of the EPB.

Based on my review of the administrative record, I find that the Plan's denial of Mr. Morris's claim on the ground that Section 4.6 applies to him was not arbitrary or capricious.

> b. *The Board's Decision that the Settlement Agreement Does Not Affect the 25% Deduction in Benefits was Not Arbitrary or Capricious*

Mr. Morris next argues that the Board's decision lacks reasonable grounds because Section 9 of the 1991 Settlement Agreement requires the Board to pay him his full retirement benefits without deducting 25%. The Board decided that the deduction applied despite the existence of the Settlement Agreement.

---

[8] If Mr. Morris did not believe Section 4.6 applied to him, it is unclear why he ever applied for the EPB in the first place. In any case, he applied for the EPB, presumably after reading Section 4.6, which explains the consequences of taking the payment. He subsequently received a letter on March 31, 1980, again explaining the consequences of taking the EPB. If Mr. Morris did not believe the provision applied to him, or believed it adversely affected him, he should have challenged the Board's decision to disburse the funds to him.

12

On January 14, 1991, Mr. Morris entered into a Settlement Agreement with the Board to settle his line-of-duty and permanent disability benefits claims under Articles 5 and 6 of the Plan. Section 9 of the Agreement provides:

> Nothing set forth herein shall waive, diminish, alter or modify Morris' right to receive full and appropriate retirement benefits under the Bert Bell NFL Player Retirement Plan or any amendments thereto, and no payment herein shall diminish Morris' entitlement to full and appropriate entitlement to retirement benefits under the Bert Bell Plan.

According to Mr. Morris, this language effectively amends the Plan and permits Mr. Morris to receive his full retirement benefits without the 25% EPB deduction.

The Settlement Agreement indicates that its sole purpose is to settle Mr. Morris' line-of-duty and permanent disability benefits claims. The Agreement does not purport to affect in any way Mr. Morris's retirement benefits; thus, it neither increases nor decreases such benefits. *See also Morris*, No. 96-03379, ECF No. 27, at 5 ("[I]n three places in the Settlement Agreement the release explicitly states that the release does not affect plaintiff's entitlement to retirement benefits as set forth in § 9 of the Settlement Agreement. It is clear that the scope of the release related to only potential claims for total and permanent disability and Line-of-Duty disability benefits.").

The plain language of Section 9 indicates that its limited purpose is to prevent Mr. Morris's settlement payment from waiving, diminishing, altering, or modifying his other retirement benefits. The provision specifically states, "*no payment herein* shall diminish Morris' entitlement to full and appropriate entitlement to retirement benefits . . .." (emphasis added). It is not the settlement payment that caused the 25% deduction in his benefits. It was his application for an EPB. The 25% deduction is unrelated to the settlement payment; rather it is based on the EPB. The Settlement Agreement does not address the EPB. Nowhere in the Settlement

Agreement do the parties agree that Section 9 amends or supersedes the Plan's provisions regarding retirement benefits or restore Mr. Morris's retirement benefits to 100% despite having taken the EPB.  Section 9 merely provides that the settlement would not affect Mr. Morris's existing rights to a retirement plan.  In line with this provision, the Board did not make any deductions to Mr. Morris's existing entitlement to retirement benefits based on the settlement payment.

I find that the Board's decision that the Settlement Agreement does not affect the 25% deduction in Mr. Morris's retirement benefits was not arbitrary or capricious.  The Board's decision reflects a reasonable reading of the Settlement Agreement.

      c.  *The Board's Decision that Article 4.6(A) Does not Apply to Mr. Morris is not Arbitrary or Capricious*

Mr. Morris argues that the Board's decision lacks reasonable grounds because Article 4.6(A) applies to him.  The Board decided that this provision does not affect Mr. Morris's retirement benefits.

Article 4.6(A) provides that if a player applied for the EPB on or before March 31, 1982, "the amount of any benefit payable in accordance with Section 5.1, 5.4, 6.3 or 7.3 shall not be adjusted to reflect the distribution of the Early Payment Benefit."  Sections 5.1 and 5.4 govern total and permanent disability claims.  Section 6.3 governs line-of-duty disability claims.  Section 7.3 governs benefit payments upon death.

After considering Mr. Morris's claim, the Board concluded that "under the Retirement Plan, EPB distribution [*sic*] taken prior to April 1982 do not reduce disability benefit payments, but do reduce retirement benefit payments."  (Minutes of February 4, 2008 Meeting, ECF No. 31-16).  Indeed, the plain language of Section 4.6(A) bars any reduction in *disability benefits*

14

where a player took the EPB before March 31, 1982. The provision does not affect retirement benefits.

Section 4.6(A) does not apply to Mr. Morris, and is irrelevant to this action, because the Plan never paid Mr. Morris any disability benefits pursuant to Section 5.1, 5.4, or 7.3. Although Mr. Morris settled certain disability claims, the Board never found that Mr. Morris was disabled. *See* Settlement Agmt, ECF No. 31-7, at 5 ("Although the Plan does not readily admit that Morris is entitled to [disability] damages, the Plan acknowledges that such claims/allegations were made . . . by Morris . . . ."); *see also Morris*, 2006 WL 5517904, at *4 ("As Plaintiff acknowledges, he settled his disability claims, was not found totally and permanently disabled by the Retirement Board, and did not receive disability benefits under Article 5 of the Plan. Accordingly, the Court finds that, as a matter of law, Plaintiff is not entitled to retirement benefits pursuant to, or at the amount determined by, Section 5.4 of the Plan."). Mr. Morris therefore never received disability benefits pursuant to the Plan.

The Board reasonably concluded that Section 4.6(A) does not apply to Mr. Morris. I find that the Board decision in this regard was not arbitrary or capricious.

> d. *The Board's Calculation of Mr. Morris's Retirement Benefits is not Arbitrary or Capricious*

Finally, Mr. Morris contests the Board's calculation of his benefits. Mr. Morris does not dispute the Board's method of calculating his retirement benefits. Instead, he disputes the numbers the Board uses is making that calculation.

Based on its calculations, the Board concluded Mr. Morris should receive $3,102.07 per month in retirement benefits. The Plan provides that the participant's monthly pension is the sum of his Benefit Credits for each credited season. The Plan determines the value of a Benefit Credit in a schedule set forth in Article 4. The value of each Benefit Credit may change from

year to year.  If a participant takes the EPB, the Plan entitles the player to receive the remaining 75% of the value of his earned Benefit Credits on the year he took the EPB, plus 100% of any subsequent increases in the value of those Benefit Credits.

To calculate Mr. Morris's benefits, the Board refers to Mr. Morris's Benefit Credits for his years of service, as well as his retirement age.  In 1980, when he took the EPB, the Benefit Credits had the following values per year of service:  (i) $85 per month for 1969; (ii) $100 per month for 1970; (iii) $105 per month for 1971; and (iv) $110 per month for each of 1971 to 1976.  Mr. Morris's Benefit Credits in 1980 had a total value of $840.  Because he took the EPB, the Plan now entitles Mr. Morris to receive 75% of $840, or $630.  Currently, the Benefit Credits are worth $250 per month for each of 1969 to 1976.   Mr. Morris's Benefit Credits have a total value of $2,000.  The total increased value of Mr. Morris's Benefit Credits is $1,160.  The Plan entitles Mr. Morris to 100% of that increased value.  Thus, Mr. Morris's base pension value would be $1,790 (i.e, $1,160 plus $630).  Because Mr. Morris waited until age 61 to receive his benefits, the Plan provides for an actuarial increase of 173.3%.[9]  Applying this increase, Mr. Morris's total monthly benefits amount to $3,102.07 (i.e., $1,790 times 173.3%).

In contrast, Mr. Morris seeks a total monthly benefit payment of $6,118.00.  Mr. Morris states that he should receive $764.75 per month for each of his credited seasons of playing football (1969 to 1976) for a monthly benefit of $6,118.00 (i.e., $764.75 times 8).  Mr. Morris does not explain how he arrived at the $764.75 monthly amount per credited season, although it appears to be a mathematical error, rather than a new argument for an additional increased payment.  Mr. Morris states that the Plan entitles him to $470 per credited season, and the Plan provides for an actuarial increase of 161% in his benefits because he deferred his retirement until he was 61 years old.  (Pl. Statement of Facts ¶ 11).

---

[9] Mr. Morris erroneously applies a 161% actuarial increase in his Motion.

16

Mr. Morris's calculations contain numerous errors. First, as I noted above, even if I were to assume his figures are correct, they still do not amount to $764.75 per month per credited season. Instead, based on the figures Mr. Morris provides to this Court, his monthly benefit would be $6,053.60, which is the amount he alleges in his Complaint. Second, under no applicable version of the Plan does Mr. Morris qualify for a $470 Benefit Credit per credited season. The current version of the Plan only provides for a $470 Benefit Credit for the 1998 season to the present. By his own admission, Mr. Morris stopped playing football in 1976. The current version of the Plan clearly states that for all credited seasons before 1982 the Benefit Credit is $250 per credited season. Third, the actuarial increase that applies to him is 173.3%, not 161%. Finally, Mr. Morris fails to apply the 25% deduction for the EPB he elected to take in 1980. As I discussed above, the Board reasonably determined that the 25% deduction applies to him.

Based on my review of the Board's calculations, I find that the Board reasonably concluded that Mr. Morris's monthly retirement benefits are $3102.07. The Board's calculation is not arbitrary or capricious.

4. Steps 4 and 5: Does a Conflict of Interest Exist?

Having determined that the Board's decision rests on reasonable grounds, I now turn to step 4 of the *Williams* analysis, which requires me to determine if the Board operated under a conflict of interest. The parties agree that the Retirement Board does not operate under a conflict of interest. A conflict of interest exists where the plan administrator determines eligibility for benefits and also pays claims out of its own assets. *See Capone*, 592 F.3d at 1195; *White*, 542 F.3d at 858. The Plan is not structured in this manner. The Retirement Board determines eligibility, but the thirty-two clubs in the NFL fund the Plan. Thus, no conflict of interest exists.

See also, e.g., *Johnson v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 468 F.3d 1082, 1086 (8th Cir. 2006) (Retirement Board does not operate under conflict of interest); *Courson v. Bert Bell NFL Player Ret. Plan*, 75 F. Supp. 2d 424, 431 (W.D. Pa. 1999) (same).

If a court finds, as here, that there is no conflict, the fifth step of the *Williams* analysis requires the court to end the inquiry and affirm the administrator's decision. Having completed the *Williams* analysis, I affirm the Retirement Board's denial of increased benefits to Mr. Morris.

### IV. CONCLUSION

For the reasons provided, it is **ORDERED and ADJUDGED** that:

1. Plaintiff's Motion for Summary Judgment (ECF No. 22) is **DENIED**.

2. Defendant's Motion for Summary Judgment (ECF No. 29) is **GRANTED**. The Defendant's denial of increased retirement benefits to Plaintiff is **AFFIRMED**.

3. The Clerk is directed to **CLOSE** this case. All pending motions, if any, are **DENIED** as moot.

**DONE and ORDERED** in chambers, at Miami, Florida, this 29th day of June 2011.

*/s/ Marcia G. Cooke*
MARCIA G. COOKE
United States District Judge

Copies furnished to:
*William C. Turnoff, U.S. Magistrate Judge*
*Eugene Morris*, pro se
*Counsel of record*